No. 2020-1758

# United States Court of Appeals
# for the Federal Circuit

JUNO THERAPEUTICS, INC., SLOAN KETTERING INSTITUTE FOR CANCER RESEARCH,

*Plaintiffs-Appellees,*

*v.*

KITE PHARMA, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the Central District of California
in Case No. 17-cv-07639, Judge Philip S. Gutierrez

## BRIEF OF PLAINTIFFS-APPELLEES

Morgan Chu
Alan J. Heinrich
Elizabeth C. Tuan
IRELL & MANELLA LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
(310) 203-7000
mchu@irell.com

Matthew J. Rubenstein
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
(612) 217-8800

Gregory A. Castanias
Jennifer L. Swize
JONES DAY
51 Louisiana Ave. NW
Washington, D.C. 20001
(202) 879-3939
gcastanias@jonesday.com

Andrea W. Jeffries
JONES DAY
555 S. Flower St.
Los Angeles, CA 90071
(213) 489-3939

Lisa L. Furby
JONES DAY
77 West Wacker Dr., Suite 3500
Chicago, IL 60601
(312) 782-3939

The claims at issue are dependent claims 3, 5, 9, and 11 of U.S. Patent No. 7,446,190. These claims (bolded below), and the claims from which they depend, are reproduced here.

1.      A nucleic acid polymer encoding a chimeric T cell receptor, said chimeric T cell receptor comprising

(a) a zeta chain portion comprising the intracellular domain of human CD3 ζ chain,

(b) a costimulatory signaling region, and

(c) a binding element that specifically interacts with a selected target, wherein the costimulatory signaling region comprises the amino acid sequence encoded by SEQ ID NO:6.

2.      The nucleic acid polymer of claim 1, wherein the binding element is an antibody.

**3.      The nucleic acid polymer of claim 2, wherein the antibody is a single chain antibody.**

**5.      The nucleic acid polymer of claim 3, wherein the single chain antibody binds to CD19.**

7.      The nucleic acid polymer of claim 1, wherein the zeta chain portion comprises the sequence obtained by amplification of human zeta chain DNA with the primers of SEQ ID Nos 1 and 2.

8.      The nucleic acid polymer of claim 7, wherein the binding element is an antibody.

**9.      The nucleic acid polymer of claim 8, wherein the antibody is a single chain antibody.**

**11.      The nucleic acid polymer of claim 9, wherein the single chain antibody binds to CD19.**

# CERTIFICATE OF INTEREST

Case No. 2020-1758

*Juno Therapeutics, Inc. v. Kite Pharma, Inc.*

Filing Party/Entity: Juno Therapeutics, Inc. and Sloan Kettering Institute for Cancer Research

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: December 14, 2020      Signature:    */s/ Gregory A. Castanias*

Name:        Gregory A. Castanias

**1. Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

(a) Juno Therapeutics, Inc. & (b) Sloan Kettering Institute for Cancer Research

**2. Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities.  Do not list the real parties if they are the same as the entities.

None

**3. Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

**Juno Therapeutics, Inc**. is a wholly owned subsidiary of Celgene Corporation. Celgene Corporation is a wholly owned subsidiary of Bristol Myers Squibb Company. Bristol Myers Squibb Company has no parent corporation, and there is no publicly held corporation that owns 10% or more of its stock.

**Sloan Kettering Institute for Cancer Research:**  Not applicable.

**4. Legal Representatives** – List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to

appear in this court for the entities.  Do not include those who have already entered an appearance in this court.  Fed. Cir. R. 47.4(a)(4).

**Jones Day**:  Luke Burton (no longer at firm), Sarah Geers, Christopher Harnett (no longer at firm), Kevin McCarthy, John Michalik, Emily Whitcher

**Irell & Manella LLP**:  Rebecca Carson, Lauren Drake (no longer at firm), Moon Hee Lee (no longer at firm), Ingrid Petersen, Crawford Maclain Wells

**King & Spalding LLP (representing third party Bristol Myers Squibb Company)**:  Joseph Akrotirianakis

**5. Related Cases** – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None

**6. Organizational Victims and Bankruptcy Cases** – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees).  Fed. Cir. R. 47.4(a)(6).

Not Applicable

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ...............................................................i

TABLE OF CONTENTS.................................................................... iii

TABLE OF AUTHORITIES ..............................................................v

TABLE OF ABBREVIATIONS .........................................................ix

STATEMENT OF RELATED CASES .................................................x

COUNTERSTATEMENT OF THE ISSUES.........................................1

INTRODUCTION .............................................................................2

COUNTERSTATEMENT OF THE CASE..............................................4

    A.    Dr. Sadelain's Revolutionary CAR Invention .....................4

    B.    The '190 Patent Claimed Dr. Sadelain's Groundbreaking
        Invention, Lauded By The Industry ......................................6

    C.    Kite Built Its Lucrative Business On Infringing The '190 Patent .......8

    D.    Plaintiffs' Infringement Suit Against Kite ...........................9

        1.    The Jury Rejected Kite's Defenses, Awarded Damages,
            And Found Kite's Infringement Willful .................................9

        2.    Judge Otero Rejected Kite's Challenges And Awarded
            Enhanced Damages For Kite's Egregious Conduct................17

SUMMARY OF ARGUMENT ..............................................................18

STANDARD OF REVIEW ..................................................................20

ARGUMENT ....................................................................................21

I.    SUBSTANTIAL EVIDENCE SUPPORTS THE SECTION 112
    VERDICT .................................................................................21

    A.    Kite Failed To Prove Lack Of Written Description ...........................22

        1.    Both Parties' Evidence Showed scFvs Were Well-
            Known, Routinely Used CAR Components ...........................23

        2.    Kite's Arguments Rest On The False Premise That The
            '190 Patent Claims A Novel "Functional Genus" .................25

        3.    Kite's Jury-Instruction Argument Is Unfounded....................29

    B.    Kite Failed To Prove Non-Enablement.............................................31

**TABLE OF CONTENTS**
(continued)

Page

II.   SUBSTANTIAL EVIDENCE SUPPORTS THE CERTIFICATE-OF-
      CORRECTION VERDICT ..................................................................33

      A.   The Intrinsic Record Made The Error And Correction Obvious
           To The POSITA ..................................................................34

      B.   Kite's Contrary Arguments Fail ...........................................38

           1.   Kite Misreads Precedent And The Patent ................................38

           2.   Kite Ignores The RCE ..............................................43

      C.   This Court May Also Affirm By Accepting Plaintiffs'
           Construction Of SEQ ID NO:6 Pre-CoC ...........................................45

III.  SUBSTANTIAL EVIDENCE SUPPORTS THE DAMAGES
      VERDICT ..............................................................................46

      A.   The Jury's Award Is Fully Supported ...............................................47

      B.   The Jury Reasonably Rejected Kite's Fact-Bound Arguments .........51

           1.   Substantial Evidence Supports The Success Payments ...........52

           2.   The Jury's Award Is Properly Apportioned ..........................55

           3.   Differences Between The Comparable And Hypothetical
                Licenses Support Dr. Sullivan's Adjustments .........................58

IV.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S
      WILLFULNESS FINDING AND JUDGE OTERO'S
      DISCRETIONARY ENHANCEMENT ......................................................59

      A.   Kite Willfully Infringed To Execute Its Business Plan.....................59

      B.   Kite's Excuses Fall Flat........................................................62

      C.   Kite's Enhancement Challenge Is Groundless ...................................65

CONCLUSION ........................................................................................66

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*,
  759 F.3d 1285 (Fed. Cir. 2014) ..........................................................30

*Amgen Inc. v. Hospira, Inc.*,
  944 F.3d 1327 (Fed. Cir. 2019) ..........................................................20

*Amgen Inc. v. Sanofi*,
  872 F.3d 1367 (Fed. Cir. 2017) ..........................................................30

*Arctic Cat Inc. v. Bombardier Recreational Prods., Inc.*,
  198 F. Supp. 3d 1343 (S.D. Fla. 2016) ...............................................61

*Ariad Pharm., Inc. v. Eli Lilly & Co.*,
  598 F.3d 1336 (Fed. Cir. 2010) (en banc) .............................22, 25, 30

*Arthrocare Corp. v. Smith & Nephew, Inc.*,
  406 F.3d 1365 (Fed. Cir. 2005) .....................................................38, 39

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015) ..........................................................51

*Bandag, Inc. v. Gerrard Tire Co.*,
  704 F.2d 1578 (Fed. Cir. 1983) ..........................................................54

*Bio-Rad Labs., Inc. v. 10X Genomics Inc.*,
  967 F.3d 1353 (Fed. Cir. 2020) ..........................................................55

*Biodex Corp. v. Loredan Biomedical, Inc.*,
  946 F.2d 850 (Fed. Cir. 1991) ............................................................29

*Bos. Sci. Corp. v. Johnson & Johnson*,
  647 F.3d 1353 (Fed. Cir. 2011) ..........................................................25

*Capon v. Eshhar*,
  418 F.3d 1349 (Fed Cir. 2005) .............................................10, 27, 28

*Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
  482 F.3d 1347 (Fed. Cir. 2007) .............................................33, 34, 38

*Chiron Corp. v. Genentech, Inc.*,
  363 F.3d 1247 (Fed. Cir. 2004) ..........................................................30

*Cubist Pharm., Inc. v. Hospira, Inc.*,
  805 F.3d 1112 (Fed. Cir. 2015) ..........................................................33

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*D Three Enters. LLC v. SunModo Corp.*,
 890 F.3d 1042 (Fed. Cir. 2018) ..........................................................30

*Eko Brands, LLC v. Adrian Rivera Maynez Enters.*,
 946 F.3d 1367 (Fed. Cir. 2020) ..........................................................20

*Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*,
 276 F. Supp. 3d 629 (E.D. Tex. 2017)......................................26, 27, 33

*Escriba v. Foster Poultry Farms, Inc.*,
 743 F.3d 1236 (9th Cir. 2014) ............................................................20

*Falkner v. Inglis*,
 448 F.3d 1357 (Fed. Cir. 2006) ..........................................................28

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
 879 F.3d 1299 (Fed. Cir. 2018) ..........................................................55

*Finjan, Inc. v. Secure Computing Corp.*,
 626 F.3d 1197 (Fed. Cir. 2010) ..........................................................58

*Gen. Elec. Co. v. Joiner*,
 522 U.S. 136 (1997)............................................................................20

*Georgetown Rail Equip. Co. v. Holland L.P.*,
 867 F.3d 1229 (Fed. Cir. 2017) ....................................................21, 62

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
 318 F. Supp. 1116 (S.D.N.Y. 1970) ..............................................13, 59

*Halo Elecs., Inc. v. Pulse Elecs., Inc.*,
 136 S. Ct. 1923 (2016)..............................................................59, 63, 64

*Hohenberg Bros. v. United States*,
 301 F.3d 1299 (Fed. Cir. 2002) ..........................................................21

*I.T.S. Rubber Co. v. Essex Rubber Co.*,
 272 U.S. 429 (1926)............................................................................45

*Idenix Pharm. LLC v. Gilead Scis. Inc.*,
 941 F.3d 1149 (Fed. Cir. 2019) ....................................................25, 31

*Immunex Corp. v. Sandoz Inc.*,
 964 F.3d 1049 (Fed. Cir. 2020) ....................................................28, 30

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*In re Wands*,
   858 F.2d 731 (Fed. Cir. 1988) ........................................................22

*King Instruments Corp. v. Perego*,
   65 F.3d 941 (Fed. Cir. 1995) .........................................................60

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) ...................................................54, 57

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ....................................................51

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
   959 F.3d 1091 (Fed. Cir. 2020) ....................................................31

*Mentor H/S, Inc. v. Med. Device All., Inc.*,
   244 F.3d 1365 (Fed. Cir. 2001) ....................................................20

*Packet Intelligence LLC v. NetScout Sys., Inc.*,
   965 F.3d 1299 (Fed. Cir. 2020) ....................................................22

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (en banc) .......................................45

*Polara Eng'g Inc. v. Campbell Co.*,
   894 F.3d 1339 (Fed. Cir. 2018) ...........................................62, 65, 66

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
   904 F.3d 965 (Fed. Cir. 2018) .......................................................55

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
   875 F.3d 1369 (Fed. Cir. 2017) ................................................60, 66

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) .........................................60, 62, 65, 66

*ResQNet.com, Inc. v. Lansa, Inc.*,
   594 F.3d 860 (Fed. Cir. 2010) .......................................................53

*SRI Int'l, Inc. v. Cisco Sys., Inc.*,
   930 F.3d 1295 (Fed. Cir. 2019) ....................................................62

*Superior Fireplace Co. v. Majestic Prods. Co.*,
   270 F.3d 1358 (Fed. Cir. 2001) ....................................................38

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*,
   920 F.3d 777 (Fed. Cir. 2019) ...........................................54

*Teva Pharm. USA, Inc. v. Sandoz, Inc.*,
   574 U.S. 318 (2015)...........................................................45

*Transocean Offshore Deepwater Drilling, Inc. v.
   Maersk Contractors USA*,
   617 F.3d 1296 (Fed. Cir. 2010) .........................................32

*Trell v. Marlee Elecs. Corp.*,
   912 F.2d 1443 (Fed. Cir. 1990) .........................................54

*U.S. Surgical Corp. v. Ethicon, Inc.*,
   103 F.3d 1554 (Fed. Cir. 1997) .........................................29

*United States v. Bilzerian*,
   926 F.2d 1285 (2d Cir. 1991) ............................................64

*Vectura Ltd. v. GlaxoSmithKline LLC*,
   __ F.3d __, 2020 WL 6788757 (Fed. Cir. Nov. 19, 2020) ................55

*VirnetX, Inc. v. Cisco Sys., Inc.*,
   767 F.3d 1308 (Fed. Cir. 2014) .........................................55

*WBIP, LLC v. Kohler Co.*,
   829 F.3d 1317 (Fed. Cir. 2016) .........................................60

*WesternGeco L.L.C. v. ION Geophysical Corp.*,
   837 F.3d 1358 (Fed. Cir. 2016) .........................................59

*Williams v. Gaye*,
   895 F.3d 1106 (9th Cir. 2018) ...........................................20

*Wordtech Sys., Inc. v. Integrated Networks Sols, Inc.*,
   609 F.3d 1308 (Fed. Cir. 2010) .........................................51

*Wyeth & Cordis Corp. v. Abbott Labs.*,
   720 F.3d 1380 (Fed. Cir. 2013) .........................................31

**STATUTES**

35 U.S.C. § 255 .......................................................................7

35 U.S.C. § 298 ......................................................................64

## TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief.

| Abbreviation | Term |
| --- | --- |
| '190 Patent | U.S. Patent No. 7,446,190 |
| CAR | chimeric antigen receptor |
| Celgene | Celgene Corporation |
| CoC | Certificate of Correction |
| FDA | U.S. Food and Drug Administration |
| Gilead | Gilead Sciences, Inc. |
| IPR | *inter partes* review |
| JMOL | judgment as a matter of law |
| Juno | Juno Therapeutics, Inc. |
| KBr. | Kite's Opening Brief |
| Kite | Kite Pharma, Inc. |
| NCI | National Cancer Institute |
| NIH | National Institutes of Health |
| Plaintiffs | Juno Therapeutics, Inc. and Sloan Kettering Institute for Cancer Research |
| POSITA | person of ordinary skill in the art |
| PTAB | Patent Trial and Appeal Board |
| PTO | U.S. Patent and Trademark Office |
| RCE | Request for Continued Examination |
| scFv | single-chain antibody variable fragment or single-chain antibody |
| SEC | U.S. Securities and Exchange Commission |
| Sloan Kettering | Sloan Kettering Institute for Cancer Research, Memorial Sloan Kettering Cancer Center, and Memorial Hospital |
| ζ | zeta |

All emphasis throughout the brief is added by Plaintiffs-Appellees unless otherwise noted.

## STATEMENT OF RELATED CASES

There has been no other appeal in or from this case, and Plaintiffs-Appellees Juno Therapeutics, Inc. and Sloan Kettering Institute for Cancer Research are not aware of any other pending case that will directly affect, or be directly affected by, the Court's decision in this case.

# COUNTERSTATEMENT OF THE ISSUES

1.      Did the jury reasonably reject Kite's attempt to prove the claims invalid under Section 112, which fixated entirely on the claims' well-known scFv element, in isolation from the full claimed three-part CAR structure?

2.      Did the jury reasonably reject Kite's attempt to prove the Certificate of Correction invalid, given that Kite's argument disregarded the full intrinsic record, including a Request for Continued Examination that specified the precise error and correction later made in the Certificate?

3.      Did substantial evidence support the jury's damages award, and did the district court act within its discretion in permitting the testimony underlying it?

4.      Did the substantial evidence of Kite's decision to build its business on copying Plaintiffs' technology support the jury's willful-infringement finding, and did the district court reasonably exercise its enhancement discretion?

**INTRODUCTION**

This case involves a novel cancer-fighting composition claimed by the '190 Patent, and an across-the-board jury verdict for Plaintiffs, upheld by the Honorable S. James Otero (now retired, *see* Appx32091).

Dr. Michel Sadelain and his colleagues at the Sloan Kettering Institute for Cancer Research designed a three-part chimeric antigen receptor ("CAR") that became the first "living drug." The invention transforms small samples of patients' T-cells into a battalion of cancer-killers capable of curing patients with just months (or weeks) to live. Important to this invention is a particular "costimulatory signaling domain," one of the CAR's three parts. Dr. Sadelain's costimulatory signaling domain comprises a particular amino-acid sequence that the field had specifically avoided. Sloan Kettering chose Juno as its exclusive licensee.

After copying Dr. Sadelain's invention, Kite hounded Sloan Kettering for a license to the '190 Patent. It tried designing around the patent. It tried to invalidate the patent in an IPR. It failed at every turn. But the financial rewards of getting to market first were too tempting. So Kite put its infringing Yescarta product into the market anyway. A jury rejected Kite's excuses, found Kite a willful infringer, and awarded a reasonable royalty for Kite's vast, profitable infringement.

2

This appeal is Kite's latest effort to avoid the '190 Patent. Kite's arguments slant (or rewrite wholesale) the facts in a manner irreconcilable with the record. Kite's inflammatory rhetoric is no answer: Sloan Kettering did not use the Certificate of Correction ("CoC") to "stretch[]" or "extend[]" the patent to "capture YESCARTA®," KBr. 2, 16—undisputed evidence establishes the CoC had nothing to do with Kite; indeed, Sloan Kettering requested the same correction years before Kite existed. Nor does the '190 Patent "threaten to kill innovation," "preempt[] an entire field of inquiry," or lend itself to analogies to "a generic patent" or a "research plan" "rife with uncertainty." KBr. 1-2, 9, 14, 24-25.

The '190 Patent expressly discloses the specific, three-part CAR structure that is claimed, making the invention ready for the POSITA to practice, as reflected in "unprecedented" industry-wide licensing interest. Kite itself easily copied Sloan Kettering's invention and desperately sought a license, and Kite's acquirer, Gilead, told the SEC within months of the hypothetical negotiation date that it valued the FDA's approval of the infringing Yescarta product, to treat just one type of cancer, at $6.2 billion. The record overwhelmingly supports the jury's verdict that the '190 Patent satisfies the Patent Act's disclosure and CoC requirements, and that Kite engaged in piracy. The judgment should be affirmed.

## COUNTERSTATEMENT OF THE CASE

Much of Kite's Statement of the Case fails to describe the facts most favorably to the verdict, or even respect the record.

### A.    Dr. Sadelain's Revolutionary CAR Invention

Since the early 1990s, researchers have worked to genetically reengineer patients' T-cells to find and destroy cancer cells.  Appx33924-33926.  Early CAR constructs involved two components: a signaling domain and a single-chain antibody variable fragment ("scFv").  Appx270 (Background of Invention); Appx271 (4:53-4:55).  The signaling domain activates the patient's T-cells to attack cancer cells.  Appx32905-32911.  scFvs are "simplif[ied]" antibodies used for binding the reengineered CAR-T-cells to the targeted cancer cells.  Appx33937; Appx32910.  Methods for making scFvs for attaching CARs to cancer cells were already well-known.  Appx271-272; Appx32908-32910; Appx33014-33015.

The early CARs worked in the lab, but failed in the clinic, producing only minimal immune responses.  Appx32910-32912; Appx33927-33930; Appx35876-35880.  One potential improvement was augmenting the signaling domain by adding a second, complementary signaling domain to cause the reengineered T-cells to replicate (or "expand"), thereby providing a more robust immune response.  The primary and costimulatory signaling domains serve as the CAR's two-part

4

"engine" or "backbone," to which the scFv is attached, yielding a "three-part" CAR.  Appx32911-32914.  It was challenging, however, to find a costimulatory domain that did the trick.  Many researchers deemed it a dead end.  Appx32910-32911.

In the early 2000s, Dr. Sadelain's team made the groundbreaking invention of employing as the costimulatory domain a particular amino-acid sequence—amino acids 114 through 220 of a protein called CD28.  Appx32915-32917.  The revolutionary combination of this sequence with the other two components—a protein called CD3ζ as the primary signaling domain, and an scFv—created the first "living drug."  Appx32913-32914; Appx33930-33931.



A single dose of this "living drug" "not only kills" targeted cancer cells, but also "divides"—"from one T-cell you have two, from two, you have four.  And this builds up an army of T-cells that go on to kill more tumor cells."  Appx32913-32914; Appx272 (invention "enables T cells to undergo repeated rounds of

antigen-dependent stimulation and expansion"). Dr. Sadelain has achieved

international acclaim for this and other work in the CAR field. Appx32901-32904;

Appx36216-36271.

### B. The '190 Patent Claimed Dr. Sadelain's Groundbreaking Invention, Lauded By The Industry

The '190 Patent has a 2002 priority date. Appx261. Claim 1 recites:

A nucleic acid polymer encoding a chimeric T cell receptor, said chimeric T cell receptor comprising

(a) a zeta chain portion comprising the intracellular domain of human CD3 ζ chain,

(b) a costimulatory signaling region, and

(c) a binding element that specifically interacts with a selected target, wherein the costimulatory signaling region comprises the amino acid sequence encoded by SEQ ID NO:6.

Appx282 (color added, corresponding to depiction below).



The primary signaling region is (a) "the intracellular domain of human CD3 ζ chain." Appx282. The "costimulatory signaling region" is (b), which "comprises the amino acid sequence encoded by SEQ ID NO:6" in the patent's sequence listing; SEQ ID NO:6 is a nucleotide sequence that encodes amino acids 114-220 of CD28. Appx282-283. Finally, (c) is "a binding element," specified as an scFv in the asserted claims (further limited by claims 5 and 11 to an scFv that binds to the CD19 protein). Appx282.

During prosecution, the inventors recognized an error in the SEQ ID NO:6 sequence listing and filed a Request for Continued Examination ("RCE") to correct it. Appx35144-35169. The application made clear in numerous ways that amino acids 114-220 of CD28 was the proper sequence for SEQ ID NO:6 to encode, Appx33834-33837, but the SEQ ID NO:6 sequence listing itself mistakenly included four additional nucleotides at the beginning and three at the end. The inventors halted issuance and filed the RCE, specifying the error and its correction. The '190 Patent issued shortly thereafter. Appx261; Appx33845-33846.

In June 2013, as Sloan Kettering explored licensing opportunities, Sloan Kettering and Dr. Sadelain learned that the '190 Patent had issued with the same sequence errors the RCE had corrected. They immediately requested a CoC, which permits the PTO to correct an applicant's "mistake of a clerical or typographical nature, or of minor character." 35 U.S.C. § 255; Appx35265-35278.

The PTO granted the request on July 16, 2013, correcting SEQ ID NO:6 consistent with the inventors' earlier RCE submission.  Appx283; Appx35279.

The value of Dr. Sadelain's groundbreaking CAR was clear to the industry, especially after a 2013 *New York Times* article highlighted its "very promising clinical trial results."  Appx33026-33029.  Sloan Kettering received "unprecedented" interest in licensing the '190 Patent—there were "dozens, maybe hundreds of phone calls."  Appx33028-33029; Appx33054-33055.  Sloan Kettering granted Juno an exclusive license.  Appx33042-33049.

### C.    Kite Built Its Lucrative Business On Infringing The '190 Patent

For years after its 2009 founding, Kite was essentially a paper company. Kite had no products, not even prospective ones; its founder, Dr. Arie Belldegrun, admitted that Kite "didn't even have the resources to develop a CAR construct, to develop a product, to do clinical trials."  Appx33193-33195.

In 2012, however, and unbeknownst to Plaintiffs, Kite joined up with the National Cancer Institute ("NCI") at NIH to commercialize a CAR.  Appx32939-32940.  Kite says it "co-developed" this CAR (ultimately branded Yescarta), KBr. 1, but they used Dr. Sadelain's invention from the start.  In 2007, NCI's Dr. Steven Rosenberg had contacted Dr. Sadelain and convinced him to disclose his breakthrough invention.  Appx32928-32938.  To this day, Kite's commercial products all use the '190 Patent's claimed CARs.

Dr. Sadelain learned the genesis of Kite's CAR long after he had collegially shared his revolutionary CAR with Dr. Rosenberg, describing the news as "perhaps the biggest shock in [his] life." Appx32939-32940. Unlike NCI, Kite was a direct competitor of Juno. "[I]t never occurred" to Dr. Sadelain that, "in providing information to a member of the National Cancer Institute who works for the U.S. government," his cancer-curing innovation would "be turned into a commercial product with an entity [Kite] that [he] had nothing to do with." Appx32939-32940.

**D.    Plaintiffs' Infringement Suit Against Kite**

When Kite launched Yescarta, in 2017, Plaintiffs sued in the Central District of California, asserting claims 3, 5, 9, and 11 of the '190 Patent. Claims 3 and 9 depend from claim 1 and further from claim 2 (which requires that "the binding element is an antibody"), and specify that the binding-element antibody is "a single chain antibody," or scFv. Appx282. Claims 5 and 11 further specify that the "single chain antibody binds to CD19." Appx282. Kite stipulated that Yescarta literally infringes the '190 Patent as corrected by the CoC. Appx7706-7709.

**1.    The Jury Rejected Kite's Defenses, Awarded Damages, And Found Kite's Infringement Willful**

The jury heard from 23 witnesses during the two-week trial. Kite's account omits and mischaracterizes key evidence.

***Written Description and Enablement***: Kite tried to meet its clear-and-convincing-evidence burden by isolating the scFv element from the claimed CARs

9

and framing the scFv as a standalone novel functional genus.  Kite's expert,

Dr. Christopher Garcia, ignored how well-known scFv technology was for CARs,

including the function and mechanism of action.  Appx33715-33717 (on cross-

examination, acknowledging prior-art publications that used scFvs in CARs).

Dr. Sadelain and Plaintiffs' expert, Dr. Thomas Brocker, an immunological

researcher with thirty years' experience, did not.  They explained that creating and

using scFvs in CARs was routine and well-known:  "scFvs had been around since

the '80s," and by the 2002 priority date of the '190 Patent, "[t]he engineering of

[scFvs] was . . . well established" with "extensive experience in laboratories to

use—to generate these scFvs."  Appx32909; *see* Appx33938-33941; Appx36163-

36167; Appx36168-36172.  From CAR development's earliest stages, researchers

readily identified and used scFvs, including CD19-binding scFvs.  Indeed,

Dr. Brocker, "one of the first in 1993 to develop" a "first generation CAR-T cell

receptor[]," explained that making an scFv was "basically standard lab work,

routine work."  Appx33926; Appx33932.  The widely-known Orlandi method

could readily be used to create scFvs.  This Court further recognized in *Capon v.*

*Eshhar* that, as of 1995—well before 2002—scFvs were well-known CAR

components that CAR patents' specifications did not need to detail.  418 F.3d

1349, 1355-58 (Fed Cir. 2005).  The '190 Patent's specification nonetheless

identified standard procedures for making scFvs, including Orlandi, and provided

well-known examples of scFvs that could be used with Dr. Sadelain's backbone. Appx271-275.

The jury found Kite failed to carry its clear-and-convincing-evidence burden on its Section 112 defenses. Appx157-158.

***Certificate of Correction***:  Kite had to prove by clear-and-convincing evidence that the POSITA would not have recognized the seven extra nucleotides' appearance in the as-issued sequence listing as an error to be fixed by removing them.  Kite's expert, Dr. Richard Junghans, effectively disregarded that the RCE—part of the intrinsic record—sought and recited that precise fix.  Instead, he "assum[ed]"—without support—that the applicants intentionally resubmitted the incorrect sequence listing while making unrelated formatting corrections. Appx33654-33656.  He also opined that the RCE's reasons for requesting changes were "scientifically implausible"—testimony refuted by the record and Plaintiffs' expert.  Appx33642.

Kite also offered Dr. Thomas Schuetz as a fact witness.  Dr. Schuetz claimed he could not discern the correction from the intrinsic record when he evaluated the patent in 2013.  Appx33530-33531.  Dr. Schuetz insisted he was "independent," but admitted on cross-examination that he had multiple ties to Kite and Gilead (which owns Kite):  He had long pursued a business relationship with Gilead, Kite's counsel engaged him as a consultant here, and Kite's own counsel

11

(including the lawyer who examined him) even represented him for his testimony in this case.  Appx33541-33546.  His credibility and purported recollection of events from 2013 were further undermined by the difficulty of uncoupling his testimony about those events from the many hours he spent in 2019 reviewing the intrinsic record with Kite's (and his) lawyers to prepare his trial testimony. Appx33547-33550.

Plaintiffs' expert Dr. John Quackenbush, a Harvard professor and department chair with thirty years' relevant experience, Appx33819-33823; Appx35985-36036, walked the jury through the intrinsic record, carefully explaining how the POSITA would readily understand that SEQ ID NO:6's inclusion of extra nucleotides was a mistake.  Dr. Quackenbush explained how the RCE—part of the intrinsic record—contained a scientifically sound explanation of the error and correction, and showed the sequence with those extra nucleotides struck through to indicate they were to be removed.  Appx33827-33834; Appx35147-35150.  Moreover, he explained, the as-issued patent itself contained ample cause for the POSITA to recognize the mistake, such as specific reference to amino acids 114-220 of CD28, as well as biological tools (called primers) used to obtain the DNA sequence that encodes that specific amino acid sequence. Appx33834-33837.

The jury found Kite failed to carry its clear-and-convincing-evidence burden on its CoC defense.  Appx157.

***Damages***:  Each side's damages expert—Plaintiffs' expert Dr. Ryan Sullivan, and Kite's expert Dr. Mohan Rao—employed the same comparable-license methodology to determine a reasonable royalty.  Appx33436-33439; Appx33454-33456; Appx33801-33802.  Each identified the same license—the Juno-Sloan Kettering license—as an appropriate starting point for analyzing the *Georgia-Pacific* factors.  Appx33454-33458; Appx33765-33766.  And each adjusted to account for the different circumstances surrounding the hypothetical negotiation, including that Juno and Kite were competitors, while Juno and Sloan Kettering were collaborators.  Appx33440-33441; Appx33454-33456; Appx33765-33766; Appx33802-33803.  The battle-of-the-experts dispute was over how to adjust and why.

Dr. Sullivan quantified damages at $585 million plus a 27.6% running royalty on infringing sales.  Appx33473-33478; Appx33587-33588.  A host of evidence reinforced his conclusion:

- At the time of the October 2017 hypothetical negotiation, Kite had obtained FDA approval and was on the eve of launching a lucrative product.  Appx33456-33457.

- Within months of the hypothetical negotiation date, Gilead ascribed $6.2 billion in value to just the single indication for Yescarta approved in October 2017.  Appx35553.

- Running-royalty rates of 20-30% and a "much more significant upfront payment" were common for late-stage technology in this field, as the jury heard from Ed Dulac, who had negotiated about 100 licenses for Celgene (which acquired Juno in 2018). Appx33389-33392.

- A few months before the hypothetical negotiation, Kite estimated Yescarta would generate $7.1 billion in operating profits over the '190 Patent's life.  Appx33474-33475; Appx35702-35705.

Dr. Rao's lower royalty of only $7.3 million plus a 10.34% running royalty (totaling only $69.7 million by trial), Appx33805, was less than half the $150 million Juno had actually paid to Sloan Kettering before any running royalties, even though Juno and Sloan Kettering were collaborators rather than competitors, and Juno secured its license far earlier in the technology's development. Appx33045-33046.  The jury rejected Dr. Rao's opinion and accepted Dr. Sullivan's.  Appx159.  Applying Kite's undisputed sales through trial, the jury awarded $778,343,501.  Appx31.

***Willfulness***:  Kite recognized the debt it owed Dr. Sadelain.  Shortly after Kite's NCI collaboration began, Dr. Antoni Ribas, from Kite's scientific advisory board, reported to Dr. Belldegrun that he had "chatted with Michel Sadelain" about Kite and his patents, learning that Dr. Sadelain "sent his" backbone to Dr. Rosenberg, "who seems to have used the CD28-CD3zeta signaling part." Appx35678-35679.  Dr. Ribas emphasized "how creative [Dr. Sadelain] has been in the CAR field and how valuable is his research for our plans."  Appx35678-

35679.  Dr. Ribas's candor earned a scolding from Kite's CEO for discussing patents via email:  "Any such communication can be damaging to Kite." Appx35677-35679.  And when a *New York Times* article reported on Dr. Rosenberg's CAR, Drs. Belldegrun and Ribas agreed "[i]t is a pity that [Dr. Rosenberg] goes on record at the NYT that the NCI CD19 CAR 'owes a lot' to Michel Sadelain."  Appx33199-33203; Appx35460-35461.

Kite searched in vain for a way around the '190 Patent.  Kite first joined the crush of companies seeking a license.  Beginning in spring 2013, "a number of people from Kite [including Dr. Belldegrun] contacted" Sloan Kettering about licensing.  Appx33032; Appx35439; Appx32940-32943.  By September, Dr. Belldegrun grew "quite persistent in wanting to set up a meeting about the Sadelain patent."  Appx33033-33035; Appx35885-35886.  Even though Dr. Yashodhara Dash, Sloan Kettering's lead negotiator for licensing the '190 Patent, told Dr. Belldegrun she was unavailable to meet, he showed up uninvited, cornered her in her cubicle, and told her Kite "needed a license to the Sadelain patent."  Appx33021-33024; Appx33035-33036; Appx33082.  Kite never got that license.  Appx33037-33042.

Kite's design-around efforts also failed.  Appx33445-33447.  This posed a serious problem for Kite.  As its then-Chief Commercial Officer admitted, without a CAR construct, "there isn't anything."  Appx26398; Appx33425.

Kite failed yet again at the PTAB.  Kite had trumpeted institution of the IPR challenging the '190 Patent, calling it a "highlight[]" for 2016.  Appx33296-33297; Appx36160-36162.  But ten months before Yescarta launched, the PTAB rejected Kite's IPR, sustaining the '190 Patent.  Appx35325-35355.  This Court summarily affirmed.  Appx7791-7792.

With these failures, Kite knew its product and pipeline were checked by the '190 Patent.  But the siren call of riches was too great—Kite had already implemented its "Project Gold" business plan, which depended on leveraging a "first mover advantage" over Juno into a lucrative buyout.  Appx33182-33193.  So Kite barreled ahead, bringing Yescarta to market notwithstanding the '190 Patent.

Kite indeed struck gold:  In October 2017, with FDA approval of Yescarta imminent, Kite sold itself to Gilead for what Dr. Belldegrun described as "a very good price."[1]  Appx33192-33193.  Dr. Belldegrun personally pocketed $660 million.  Appx33188-33189.

Kite tried to rebut this overwhelming evidence through Dr. Belldegrun.  But he repeatedly undermined his own credibility—telling a tale Judge Otero later described as "not credible."  Appx41.  He concocted a fable that denied the obvious, refusing to concede "Kite wanted to beat Juno in the race to clinical

---

[1] Although the exact figure did not come in at trial, the sale price was almost $12 billion.  Appx47.

16

approval," Appx33181, and insisting his meeting with Dr. Dash was only about accessing patients for clinical trials, not licensing the '190 Patent. Appx33258-33263. Dr. Dash said otherwise. More devastatingly, Kite's CEO at the time did too. Appx33922-33924. Abundant other evidence also refuted Dr. Belldegrun's story, including several contemporaneous internal documents from Kite and Gilead. In one 2014 email, Dr. Belldegrun wrote, with exclamation points galore, that "being first is the name of the game for us!!!!" Appx35446-35447. In April 2016, Kite pegged the value of this first-mover advantage at "5-10 percentage points" in market share, even ten years post-commercialization. Appx35468; *see* Appx35462-35468. In the midst of acquiring Kite in 2017, Gilead put it succinctly: "Why Kite instead of Juno? First mover advantage." Appx35626; *see* Appx35622-35629.

Against this mountain of proof, Kite presented no evidence it sold Yescarta in actual reliance on any good-faith belief that the '190 Patent was invalid or not infringed. The jury's willfulness finding was amply supported and unsurprising.

### 2. Judge Otero Rejected Kite's Challenges And Awarded Enhanced Damages For Kite's Egregious Conduct

Judge Otero rejected Kite's post-trial motions, finding substantial evidence supported the verdict. Appx57-86. He also exercised his discretion to enhance damages by 50%. Appx33-56. Having presided over the trial, he summarized Kite's conduct as "wanton, malicious and bad-faith behavior"; Kite "knew of the

Sadelain backbone claimed in the '190 Patent at least as of 2013, attempted

aggressively to license the '190 Patent, affirmatively attempted to invalidate the

'190 Patent by filing an IPR, then when neither of those steps was successful,

chose to accelerate YESCARTA® to market to its own advantage and to Plaintiffs'

corresponding detriment, all while knowing that Plaintiffs' assertion of the '190

Patent in this litigation was . . . inevitable." Appx41-42 (internal quotation marks

omitted). Judge Otero also awarded a 27.6% running royalty on ongoing sales.[2]

Appx52-54.

## SUMMARY OF ARGUMENT

**I.**     As the jury properly found, the '190 Patent's three-part CAR is

adequately described and enabled. The novel two-part backbone, unchallenged by

Kite, is explicitly defined by DNA sequences in the patent. The third part, the

scFv binding element, was undisputedly well known and readily available. Kite's

brief mischaracterizes the claims, evidence, and precedent, and fails to satisfy its

high burden. Kite's new-trial demand, based on the written-description jury

instructions, similarly mischaracterizes the patent claims and law.

---

[2] Kite grouses, but does not challenge, that "the court granted Kite less than 12
hours to defend against this billion-dollar case." KBr. 18. As Judge Otero
repeatedly recounted, he remained flexible, granting Kite additional time on four
different occasions; Kite did not even use all its time. Appx84-85; Appx24783;
Appx33992-33993.

**II.** The intrinsic record and expert testimony amply justify the jury's rejection of Kite's CoC defense. Kite's arguments again ignore the evidence—including the RCE's request for the precise correction later made in the CoC—the law, and its high burden. As an alternative ground for affirming, this Court should conclude, for much the same reasons, that the district court should have construed the patent not to include the seven extraneous nucleotides even before the CoC.

**III.** The jury's damages verdict, supported by methodology and a comparable license used by *both* sides' experts, and by copious real-world evidence, reasonably compensates Plaintiffs for Kite's admitted infringement. Any reasonable company would readily pay $778 million ($585 million plus a 27.6% royalty on sales) in order to market a product it contemporaneously valued at $6.2 billion. The experts' dispute over the appropriate adjustments to the comparable license were factual issues the jury properly resolved.

**IV.** Kite knowingly built Yescarta on Dr. Sadelain's backbone. Aware a bill would eventually come due, Kite tried every possible avenue to evade the '190 Patent. When all failed, Kite brazenly chose infringement. Kite's *post hoc* supposed defenses are irrelevant (Kite offered no proof it actually relied on them), and the jury properly found Kite's infringement willful. Based on this evidence, and more, of Kite's egregious misconduct, Judge Otero's 50% enhanced-damages award was an appropriate exercise of discretion.

## STANDARD OF REVIEW

This Court reviews JMOL denials de novo, applying regional circuit law. *Amgen Inc. v. Hospira, Inc.*, 944 F.3d 1327, 1333 (Fed. Cir. 2019).  JMOL is proper only "if the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, and that conclusion is contrary to the jury's verdict." *Escriba v. Foster Poultry Farms, Inc.*, 743 F.3d 1236, 1242 (9th Cir. 2014).  "A jury's verdict must be upheld if it is supported by substantial evidence that is adequate to support the jury's findings, even if contrary findings are also possible." *Id.*  "[T]he court must draw all reasonable inferences in favor of the nonmoving party and 'disregard all evidence favorable to the moving party that the jury is not required to believe.'" *Id.* at 1242-43.  "Courts grant JMOL for the party bearing the burden of proof only in extreme cases," where that party "established its case by evidence that the jury would not be at liberty to disbelieve and the only reasonable conclusion is in its favor." *Mentor H/S, Inc. v. Med. Device All., Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001).  The Court reviews jury instructions for their "correctness." *Eko Brands, LLC v. Adrian Rivera Maynez Enters.*, 946 F.3d 1367, 1379 (Fed. Cir. 2020).

Abuse-of-discretion review governs Kite's remaining issues. *Williams v. Gaye*, 895 F.3d 1106, 1122 (9th Cir. 2018) (denial of new trial); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) (evidentiary rulings, including expert testimony);

20

*Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1244 (Fed. Cir. 2017)

(enhanced damages). An abuse of discretion means that the court's decision was

"clearly unreasonable, arbitrary or fanciful, or based on clearly erroneous findings

of fact or erroneous conclusions of law." *Hohenberg Bros. v. United States*, 301

F.3d 1299, 1303 (Fed. Cir. 2002).

## ARGUMENT

## I.     SUBSTANTIAL EVIDENCE SUPPORTS THE SECTION 112 VERDICT

Dr. Sadelain's patented CAR construct took known elements from CAR-T

art (scFvs and signaling domains) and, with the addition of a second, specific

costimulatory signaling domain to form the CAR's backbone, turned a scientific

dead-end into a revolutionary cancer-fighting weapon. Kite's brief would leave

the reader thinking the '190 Patent claims only scFvs, or that the use of scFvs in

CARs was novel or unduly challenging, none of which is true. Kite's bombastic

assertions that an artisan would have to test "millions of billions" of scFvs to

determine which ones meet the claims, KBr. 26-27, and that Plaintiffs are

"flagrant[ly]" attempting to cover all CARs based on having "made CAR-Ts

targeting only two antigens," thereby "kill[ing] innovation," KBr. 1, 23-24, all rest

on those fictions.

Relatedly, Kite ignores the burdens it must meet to overturn the jury's

verdict. Written description is a "question of fact" asking whether the patent

"reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc).  Enablement, which ultimately asks whether the POSITA would have to engage in "undue experimentation" to make and use the invention, similarly depends on at least seven intensely factual inquiries from *In re Wands*, 858 F.2d 731 (Fed. Cir. 1988).  To overcome the stringent JMOL standard, Kite needed to present clear-and-convincing evidence proving its defenses as a matter of law.  Kite did not.

There is no reason for this Court to depart from the jury's—and Judge Otero's—recognition of the '190 Patent's disclosure.  The jury saw and heard live witness testimony and substantial documentary evidence on the whole claimed invention, including the well-known scFv component. *See supra* at 9-11.  It was best positioned to conduct the "jury functions" of "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts." *Packet Intelligence LLC v. NetScout Sys., Inc.*, 965 F.3d 1299, 1305 (Fed. Cir. 2020).

## A.    Kite Failed To Prove Lack Of Written Description

The '190 Patent inventors plainly had possession of their claimed three-part CAR, including the scFv component.  The patent referred to known scFv technology and provided specific examples.  No further teaching was needed.

Kite's arguments attempting to transform this well-known, routinely used CAR

component into a standalone novel functional genus should be rejected.

### 1.    Both Parties' Evidence Showed scFvs Were Well-Known, Routinely Used CAR Components

Undisputed evidence showed scFvs to be "well-known," "old technology"

originally produced in the 1980s and incorporated into CARs since at least the

early 1990s.  *E.g.*, Appx33931-33935; Appx33938-33939; Appx32909;

Appx33208-33209.  Pre-2002 publications, including a 1993 publication by

Dr. Brocker and other articles cited in Kite's IPR, confirmed that "scFvs had been

successfully used as the binding elements in [CARs]."  Appx35766-35768; *see*

Appx35876-35880; Appx36283-36290; Appx37501-37508.  Likewise, during

claim construction here, Kite admitted:  "Well before the '190 Patent, researchers

developed 'dual-signal' CARs that incorporated an antibody/antibody fragment

(such as an scFv) . . . ."  Appx2602.

scFvs' interchangeability in CAR design was a long-known key feature of

their "very similar," "common" structure.  Appx33935-33940; Appx35876-35880.

While "[y]ou can have different single-chain Fvs with different amino acid

sequences," each scFv "need[s] to maintain these [common] structures."

Appx33938.  Indeed, Dr. Sadelain "placed multiple" CD19 scFvs "on our

backbone," and every single one "worked."  Appx32922-32923; Appx33943-

33944.

It was also undisputed that, by 2002, the POSITA could make an scFv for any antigen, using the routine "Orlandi" method. The jury heard Kite's expert Dr. Garcia explain that this method merely involved selecting a target antigen and then injecting a mouse with that antigen so that it would make antibodies to create the relevant scFv. Appx33678-33679; *see* Appx36185-36189 (Orlandi Article). The '190 Patent specification itself describes Orlandi's method. Appx271-272. It was "the cookbook" and "the recipe" for making an scFv for any particular CAR. Appx33014-33015; Appx33945. This was not a "challenge[]" for the POSITA, KBr. 7; in fact, a self-taught member of Dr. Brocker's lab, hired as a lab dishwasher, successfully used the Orlandi method. Appx33942; Appx33966; Appx63.

Moreover, multiple scFvs for specific targets were already known. As the jury heard in the context of claims 5 and 11, which are limited to scFvs that bind to the CD19 antigen, "scientists could just look [CD19 scFvs] up in the literature" and find "different choices" that "were decades old." Appx33209-33211; Appx33942-33944. The particular CD19 scFv to which Dr. Sadelain directed Dr. Rosenberg, and which Kite employs in Yescarta, was known by 1997. Appx33946-33947.

Consistent with the state of the art, the '190 Patent cites numerous scFvs, *e.g.*, Appx34796-34822, and describes two working embodiments with scFvs

24

directed to very different cell types and antigens: prostate cancer cells expressing

the prostate-specific membrane antigen, and blood cancer cells expressing CD19.

Appx272-275.  Dr. Brocker testified that "of course" the examples were

representative of "all other single-chain Fvs" in the context of a CAR.

Appx33944-33945.

In short, the process of making and using scFvs as binding elements in

CARs was routine and well known.

### 2.    Kite's Arguments Rest On The False Premise That The '190 Patent Claims A Novel "Functional Genus"

Kite's written-description arguments turn on the erroneous notion that the

claims recite a novel "functional genus" of scFvs.  KBr. 19.  Kite's arguments

seize upon irrelevant precedent, including the *Ariad* decision, involving method

claims that recited a newly-identified cellular function or mechanism of action

where this Court found the patents invalid because the skilled artisan had to engage

in a "trial and error" approach to identify which of the structurally-identified

compounds would perform the newly-found function.  *Ariad*, 598 F.3d at 1354

(claiming methods of using *new* molecules "*potentially capable* of reducing NF-êB

activity"); *see Idenix Pharm. LLC v. Gilead Scis. Inc.,* 941 F.3d 1149, 1163-65

(Fed. Cir. 2019) (claiming *new use* of certain ribonucleosides to treat hepatitis C);

*Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1364-67 (Fed. Cir. 2011)

(claiming *new use* of macrocyclic lactone analogs of rapamycin).  Relying on this

precedent, Kite criticizes the '190 Patent for not disclosing a representative number of species or common structural features of the supposed scFv "functional genus," based on scFvs being "highly diverse" in the abstract. KBr. 29-30, 33.

Kite disregards the claims and the record. The claims do not describe a novel function for scFvs; they claim their use in CARs. That function of scFvs, their mechanism of action in CARs, and how to make scFvs were all known. As Judge Bryson explained in *UroPep*, while "[i]t is often the case that a patent claiming the invention of a new genus, or the use of a new genus, must provide more detail regarding that genus, such as disclosing a number of representative species or a structural feature by which to recognize the new genus," when instead "*a genus is well understood in the art and not itself the invention but is instead a component of the claim, background knowledge may provide the necessary support for the claim*." *Erfindergemeinschaft UroPep GbR v. Eli Lilly & Co.*, 276 F. Supp. 3d 629, 646-48 (E.D. Tex. 2017) (upholding jury verdict that rejected written-description defense, where the "function" of the compounds was already "known in the art" and the claimed effect "already achieved"), *aff'd*, 739 F. App'x 643 (Fed. Cir. 2018).

Judge Otero acknowledged the similarity between this case and *UroPep*, Appx63, but Kite ignores it. *UroPep*—affirmed under Rule 36—details the Court's written-description law and is indistinguishable from this case. As *UroPep*

26

explains hypothetically, "a claim might be directed to the novel use of a particular salt, where the salt must be dissolved in a 'solubilizing agent.'  The broad genus of 'solubilizing agents' would not require representative species if persons of skill knew of many solvents that could dissolve the salt."  276 F. Supp. 3d at 649.  So, too, here with the scFv-specific "binding element" that "specifically interacts with a selected target."  *See supra* at 23-25.

Kite's errors are compounded by its omission of *Capon*, which concerned not just CAR technology, but scFvs, and which Judge Otero (and *UroPep*) cited.  Appx62; *UroPep*, 276 F. Supp. 3d at 647 ("As in *Capon*, it was undisputed at trial that hundreds of selective PDE5 inhibitors, as well as their function, were known in the art at the time of the invention," and "[i]t was also clear that selective PDE5 inhibitors were not themselves the invention.").  *Capon* determined that, as of 1995, well before the priority date here, scFvs were well-known CAR components that did not need to be detailed in CAR patents' specifications to satisfy Section 112.  418 F.3d at 1355-61 (both written description and enablement satisfied).  As *Capon* explained, the "invention does not concern the discovery of gene function or sequence" or "discovering which DNA segments are related to the immune response," but instead "the novel combination of the DNA segments to achieve a novel result."  *Id.* at 1358; *see* Appx33960-33962.

This Court has repeatedly cited *Capon*. *Capon* espoused the now "well-established" point "that a patent specification need not re-describe known prior art concepts." *E.g.*, *Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1064 (Fed. Cir. 2020) (citing *Capon*). Moreover, "a requirement that patentees recite known DNA structures, if one existed, would serve no goal of the written description requirement. It would neither enforce the quid pro quo between the patentee and the public by forcing the disclosure of new information, nor would it be necessary to demonstrate to a [POSITA] that the patentee was in possession of the claimed invention." *Falkner v. Inglis*, 448 F.3d 1357, 1368 (Fed. Cir. 2006) (citing *Capon*). That describes the scFv component here to a tee. Kite's failure to mention *Capon* is all the more egregious because Kite has licenses to patents in the same lineage as both the Capon patents and the Eshhar applications at issue there. Appx36190-36191.

Kite's fictional proposition—spending countless hours developing "millions of billions of" scFvs "in isolation" from any target antigen, and then testing to see if they fit a particular cancer cell, KBr. 29-30, 32, 45—does not matter to the POSITA. Likewise for Kite's fictional concern that there is "no way to predict ex ante which scFvs would bind." KBr. 28. Notably, Kite presented no percipient witness evidence or documentary corroboration that the POSITA would actually operate this way; it presented only Dr. Garcia's theorizing, which no jury had to

accept. Nor has Kite presented any evidence or argument explaining why it matters—in the context of the claimed invention—that scFvs may be "highly diverse" in the abstract. KBr. 29-30. That is because it does not. *See supra* at 23-28.

### 3.    Kite's Jury-Instruction Argument Is Unfounded

In reviewing jury instructions, courts must pay "due attention to their clarity, objectivity, and adequacy, taken as a whole." *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1564 (Fed. Cir. 1997). Judge Otero's written-description instructions were correct. Tracking the Northern District of California Model Patent Jury Instructions, they accurately instructed that the "purpose of th[e] written description requirement is to demonstrate that the inventor was in possession of the invention at the time the application" was filed and that the "written description requirement is satisfied if a [POSITA] in the field reading the original patent application at the time it was filed would have recognized that the patent application described the invention as claimed." Appx139.

Kite cannot legitimately complain that Judge Otero rejected Kite's confusing, biased proposal that contained terminology (*e.g.*, "genus") *never* used by any witness. Appx14790-14794; KBr. 41. "A party has no vested right in its own carefully couched form of words in an instruction." *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 854 (Fed. Cir. 1991). Nor can Kite complain that

the instructions did not parrot specific language from *Ariad*.  Judge Otero was not required to "use identical language" from any particular opinion.  *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1259 (Fed. Cir. 2004).  *Ariad* itself states that "the description requirement does not demand any particular form of disclosure."  598 F.3d at 1352.  Besides, as noted above, the *Ariad* formulation is not germane here.  *E.g.*, *Immunex*, 964 F.3d at 1064.

Kite's string cite is inapt.  *See* KBr. 40.  Only one of Kite's cases, *Amgen Inc. v. Sanofi*, addressed written-description instructions, and it flatly rejected inclusion of a party's detailed language.  872 F.3d 1367, 1378-79 (Fed. Cir. 2017).  Another concerned summary judgment, never mentioning instructions.  *D Three Enters. LLC v. SunModo Corp.*, 890 F.3d 1042, 1044-45 (Fed. Cir. 2018).  The third concerned an instruction "on weighing evidence," not the written-description standard.  *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1303-05 (Fed. Cir. 2014).

Kite also fails to show harm, even assuming error.  scFvs have common structural features, Appx33936-33938, and the patent provides representative examples, Appx33944-33945.  *See supra* at 23-25.  Kite presented no evidence from which a jury would have been compelled, or even able, to find otherwise.

## B.    Kite Failed To Prove Non-Enablement

Kite pushes the same false narrative in asking the Court to make a non-enablement finding on appeal.  In *Wyeth* and *Idenix*, the claims' structural elements were found to "encompass[] 'millions of compounds made by varying the substituent groups,' while only a 'significantly smaller' subset would produce the claimed 'functional effects.'"  *Idenix*, 941 F.3d at 1162-63 (quoting and analogizing to *Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380, 1384 (Fed. Cir. 2013)).  Under those very different circumstances, this Court found that each of at least tens of thousands of structural compounds would have to be made and screened.  *Wyeth*, 720 F.3d at 1385-86; *Idenix*, 941 F.3d at 1162-63.  But practicing the claims of the '190 Patent does not require an "iterative, trial-and-error process."  *Wyeth*, 720 F.3d at 1386.  Kite, assuming facts the jury was not required to find, points to a theoretical quantification of scFvs—"millions of billions" or "$10^{115}$"—and argues only a "fraction of the candidates" will work.  KBr. 26-28.  These are the same "abstract assertions of breadth" condemned by *McRO, Inc. v. Bandai Namco Games America Inc.*, 959 F.3d 1091, 1104 (Fed. Cir. 2020).  There is no need to test "millions of billions" of scFv candidates to see which will work.  The POSITA starts with a known target antigen and uses predictable, routine methods to construct an scFv that will bind to the antigen.

Kite distorts snippets of evidence to fit its incorrect "making and testing is required" theme. KBr. 19. It points to Juno's "test[ing] a billion CD19-specific scFvs." *E.g.*, KBr. 27, 43. This evidence is irrelevant; Juno was "optimiz[ing]" scFvs. Appx26414; Appx33668; *see* KBr. 28. A patent need not enable "development of the most optimized configuration." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Contractors USA*, 617 F.3d 1296, 1306-07 (Fed. Cir. 2010). Kite also points to Dr. Garcia's testimony about needing "six months to a year" to make and test one new scFv and the allegedly "undisputed testimony that scFvs often did lose functionality when incorporated into a CAR," which is based solely on Dr. Garcia, not any "undisputed" facts. KBr. 42, 45. Rather, the evidence, including Kite's cited articles, KBr. 27, showed that making and testing scFvs for their ability to bind to selected targets is "simple" and "not more than standard laboratory procedure[]." Appx36182; Appx33966. And the jury heard Dr. Brocker's testimony that the '190 Patent's backbone has worked with every scFv with which it has been tested, and *he does not know "a single" scFv* that would not work with it to create an effective CAR. Appx33965-33966; *see also* Appx32917 (Dr. Sadelain confirming the '190 Patent's backbone works with scFvs targeting "a multitude" of different antigens); Appx32944-32946; Appx32980-32981 (further testifying to its "very high likelihood of working" with any given scFv). Dr. Rosenberg's own use of the CD19 scFv suggested by

Dr. Sadelain (a different one than Dr. Sadelain used) further supports the interchangeability of CD19-specific scFvs. Appx32930-32933; Appx35469-35477; Appx35483-35488.

Kite's abstract, iterative-trial-and-error argument directly contradicts the real-world record. scFvs—used with CARs—were well known, and skilled artisans had long used techniques like those described in the '190 Patent to produce scFvs for selected targets. *See supra* at 23-25. Even Dr. Garcia admitted that, once a "selected target" is identified, the POSITA knows how to identify, synthesize, and clone suitable scFvs. Appx33678-33679.

The jury was entitled to reject Kite's non-enablement argument. Detailed, credible testimony describing the routine use of scFvs in CARs—supported by personal experience—contradicted it. *See, e.g.*, *UroPep*, 276 F. Supp. 3d at 659-63 (upholding jury's enablement findings).

## II. SUBSTANTIAL EVIDENCE SUPPORTS THE CERTIFICATE-OF-CORRECTION VERDICT

As part of the '190 Patent, the CoC carries a presumption of validity requiring clear-and-convincing evidence to overcome. *Cubist Pharm., Inc. v. Hospira, Inc.*, 805 F.3d 1112, 1118 (Fed. Cir. 2015). A CoC may correct a clerical or typographical error, even if the correction broadens the scope of the claims, as long as both the error and how to correct it are clearly evident to the POSITA reviewing the full intrinsic record. *Cent. Admixture Pharm. Servs., Inc. v.*

*Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1353 (Fed. Cir. 2007); Appx138.

Whether a CoC broadens a claim is reviewed de novo; whether the error and the

correction are clearly evident only for substantial evidence. *Cent. Admixture*, 482

F.3d at 1354. Kite has not demonstrated that *no* reasonable jury could conclude it

failed to establish this second, factual condition by clear-and-convincing evidence.

### A.     The Intrinsic Record Made The Error And Correction Obvious To The POSITA

Although not their burden, Plaintiffs provided copious evidence establishing

the CoC's validity, including the full intrinsic record and expert testimony from

Dr. Quackenbush. He explained how that record made clear that the presence in

SEQ ID NO:6 of seven nucleotides beyond those encoding Dr. Sadelain's

inventive use of amino acids 114-220 of CD28 was an obvious error to be fixed by

removing them, correcting the sequence from nucleotides 336-663 of CD28 to

nucleotides 340-660 of CD28.

As Dr. Quackenbush testified, the RCE provided a clear explanation for the

CoC's exact corrections. Appx35147-35150. The RCE's importance is

demonstrated by the fact that its filing "stopped the process of issuing the patent"

when only payment of the issue fee remained. Appx33827-33828. The RCE

displayed SEQ ID NO:6 with the seven extra nucleotides struck through, a

standard way to show they were to be deleted. Appx35150.

Appln No.:   10/448,256
RCE Amendment Dated: September 4, 2007

```
caaaattgaa  gttatgtatc  ctcctcctta  cctagacaat  gagaagagca  atggaaccat
tatccatgtg  aaagggaaac  acctttgtcc  aagtcccta  tttcccggac  cttctaagcc
cttttgggtg  ctggtggtgg  ttggtggagt  cctggcttgc  tatagcttgc  tagtaacagt
ggcctttatt  attttctggg  tgaggagtaa  gaggagcagg  ctcctgcaca  gtgactacat
gaacatgact  ccccgccgcc  ccgggcccac  ccgcaagcat  taccagccct  atgccccacc
acgcgacttc  gcagcctatc  gctcctga
```

Appx35150 (yellow, red added).

Represented by the letters a, c, g, and t, nucleotides encode amino acids. Each set of three nucleotides, called a "codon," corresponds to either a specific amino acid or a "stop codon" indicating that the sequence is complete. Appx32915; Appx33829; Appx33840-33841.  To select a particular portion of an amino-acid or nucleotide sequence, scientists commonly use "primers," which act like bookends to "amplify"—*i.e.*, generate copies of—the desired sequence. Appx32918-32919; Appx33836-33837.

The RCE explained the reasons for its correction.  To begin, "the first codon of the amplified portion of the CD28 sequence is att (which encodes [isoleucine]) and this corresponds to the sequence starting at position 114" of CD28. Appx35149.  This corrected sequence, the RCE noted, corresponds to the CD28 portion "amplified by the primers of Seq. ID Nos. 4 and 5" and "correctly reflect[s]

35

the [nucleotides] corresponding to the amino acid used in the construct of the examples." Appx35149. Just as the RCE suggested, both the primers represented by SEQ ID Nos. 4 and 5 and all of Dr. Sadelain's experiments pointed to amino acids 114-220, not 113-220. Appx33828-33829; Appx33835-33836. The RCE further noted that because SEQ ID NO:6 was defined as a coding sequence, it needed to have a number of nucleotides divisible by three, as the corrected version—but not the uncorrected version—did. Appx35149; Appx33844; *see* Appx33839-33840 (Quackenbush) ("If [my students] submitted a coding sequence that wasn't divisible by three, I would send them back and tell them to fix it.").

The RCE also corrected the omission of one nucleotide in the sequence listing for SEQ ID NO:4, conforming it to the accurate primer sequence provided in the specification. Appx35149. Finally, the RCE made two changes to column 4 of the specification consistent with removing the extraneous nucleotides— replacing a reference to nucleotide 336 with nucleotide 340, and expressly referencing amino acid 114. Appx35148. In short, consistent with the applicants' duty of candor, the RCE contained a detailed, scientific explanation of the change, with no ambiguity as to the error or the correction.

After the PTO approved the RCE's changes and the applicants twice submitted the RCE's corrected sequence listing, Appx35147-35162; Appx35174-35190, the PTO requested an unrelated formatting change. Appx35192-35196.

The evidence showed that the applicants' patent attorney inadvertently made this formatting change to the original—superseded—version of the sequence listing, rather than the version corrected with the RCE.  Appx35208-35220; *see* Appx33830-33833 (Quackenbush).  Thus, the as-issued sequence listing omitted the RCE's corrections to SEQ ID NOs: 4 and 6.  But because the PTO requested resubmission of only the sequence listing, the as-issued patent included the other RCE corrections—column 4's switch from nucleotide 336 to 340, and its express reference to amino acid 114 as the first amino acid encoded by SEQ ID NO:6.  Appx271.

Beyond these explicit references, the specification defines primers that indisputably amplify nucleotides encoding amino acids 114-220 (not 113-220) of CD28.  Appx273; *see* Appx33835-33836 (Quackenbush); Appx32919-32922 (Sadelain).  As Dr. Quackenbush explained, scientists often refer to sequences by primers that amplify them.  Appx33836-33837.  Indeed, when Dr. Sadelain shared his revolutionary backbone with Dr. Rosenberg, he did so by identifying primers used to amplify the critical sequence.  Appx32930.  Moreover, the not-divisible-by-three error had reappeared, presenting a "red flag" that would tell the POSITA "hey, something is wrong, you better check other evidence."  Appx33839-33840 (Quackenbush).

The jury's conclusion was certainly reasonable, if not compelled: the

POSITA would understand from the entire intrinsic record that the seven extra

nucleotides' presence was an error to be corrected by their removal.  Kite has no

plausible explanation, let alone *clear-and-convincing evidence*, for how the

POSITA *had to* conclude anything else.  *See Arthrocare Corp. v. Smith & Nephew,

Inc.*, 406 F.3d 1365, 1374-75 (Fed. Cir. 2005) (affirming jury's rejection of CoC

invalidity argument, based on intrinsic record and expert testimony).

## B.    Kite's Contrary Arguments Fail

### 1.    Kite Misreads Precedent And The Patent

At the outset, Kite asserts there can be no "clearly evident" error whenever

the language in question is "spelled correctly and reads logically in the context of

the sentence" and produces claims "generally effective for their stated purpose."

KBr. 49 (internal quotation marks omitted).  Both of Kite's cases reject this

myopic approach, recognizing that other aspects of the intrinsic record must also

be considered.  Thus, *Superior Fireplace Co. v. Majestic Products Co.* identified a

"mistake" in the patent even while noting that "[t]here is no grammatical error that

suggests a mistake" in "[t]he claim language in question."  270 F.3d 1358, 1373-75

(Fed. Cir. 2001).  And *Central Admixture* acknowledged that mistakes can be

clearly evident if the prosecution history makes the language "nonsensical in light

of the specification."  482 F.3d at 1354.  Just so here.  The jury reasonably found

the POSITA would have realized from the RCE and the rest of the intrinsic record that as-issued SEQ ID NO:6 contained a clearly evident error. *See Arthrocare*, 406 F.3d at 1374-75 (upholding correction from "active electrode" to "electrode terminal" although both phrases were grammatical and related to the invention's subject). Kite has never offered any case in any court—and to Plaintiffs' knowledge, none exists—invalidating a CoC where the prosecution history included an RCE that expressly specified the precise error and correction.

Glossing over the RCE, Kite cherry-picks snippets of the specification it says would prevent the POSITA from appreciating the extra nucleotides were a mistake. KBr. 49-50. These include a reference in column 7 to "nucleotides 336-660 of CD28." KBr. 50. But that is just another instance of the same mistaken inclusion of extra nucleotides the CoC corrected. Indeed, column 7 itself makes this mistake clear by stating that the nucleotides in question are "amplified using [the] primers" found in SEQ ID NOs: 4 and 5. Appx273. As Dr. Quackenbush told the jury (and Kite has never contested), these primers amplify nucleotides encoding amino acids 114-220 (not 113-220) of CD28. Appx33835-33836. From the full record, the POSITA would readily understand that column 4, not column 7, represented the invention. *See Arthrocare*, 406 F.3d at 1375 (failure to correct another mistake of the same type a CoC corrected did not invalidate the CoC; the

39

"simple explanation" was that the same error was made twice and corrected only once). At the very least, the jury could reasonably so conclude.

Nor does it matter that column 4 says the nucleotide sequence "includes the stop codon," which the corrected sequence does not. KBr. 56. Kite's own expert testified that removing the stop codon was of no "consequence." Appx33629-33630. He was right. With or without it, the corrected sequence encodes amino acids 114-220 of CD28.

Kite's contrary reading of the interplay between column 4 and the primers on one hand, and column 7 on the other, depends on a misreading of the patent the POSITA would not make. According to Kite, the '190 Patent indicates that both column 4's example and the primers correspond to only "a portion of SEQ ID NO:6." KBr. 51-52. In fact, column 4 refers to "the portion of CD28 cDNA spanning nucleotides 340 to 663, including the stop codon (amino acids 114-220 of [CD28])." Appx271. "This portion of CD28"—defined as "nucleotides 340 to 663" and "amino acids 114-220"—"can be amplified by PCR using the primers of Seq. ID NO. 4 and 5." Appx271. And "[t]he full sequence of this region"—again referring back to "nucleotides 340 to 663" and "amino acids 114-220"—"is set forth in Seq ID No:6." Appx271. Thus, while both amino acids 114-220 and the primers correspond to a "portion of CD28," column 4 indicates that that "portion"

is identical to the "region [that] is set forth in Seq ID No:6." Appx271; *see* Appx33835.

Kite also argues the POSITA would not know whether to conform SEQ ID NO:6 to column 4 and the primers or vice versa. KBr. 56. Kite is wrong. The RCE made the right fix clear: removing SEQ ID NO:6's extra nucleotides. That is especially so given the as-issued patent's inclusion of the RCE's edits to column 4 to reference amino acid 114 and nucleotide 340 instead of nucleotide 336. Similarly unpersuasive is Kite's claim that the POSITA could not determine whether to alter the primers or make the CoC's change because the primers amplify 322 nucleotides, rather than the 321 nucleotides listed in the CoC. KBr. 57. Either way, the sequence the primers amplify encodes amino acids 114-220 of CD28, just as the CoC's sequence does. Appx33835-33836. To the degree any doubt remained, the RCE, which had previously made the same change as the CoC, would have cleared it up.

Kite's cursory references to other aspects of the intrinsic record are equally unavailing. Kite notes that the specification cites articles mentioning nucleotide sequences starting with 336. KBr. 50. These articles predate the RCE, and the POSITA would understand that they reflected the same error subsequently identified and corrected. Appx33842-33843; Appx33883-33887. Kite also notes the existence of SEQ ID NO:11, which reproduces amino acids 113-220 of CD28.

KBr. 50.  That sequence is irrelevant because it neither appears nor is referenced anywhere else in the patent.  Appx33837-33838; Appx112 (Claim-Construction Opinion) (SEQ ID NO:11 "carries little weight . . . and is, it seems, vestigial.").

Moving beyond the intrinsic record, Kite claims support from supposed "real-world evidence" from Dr. Schuetz, who said he recognized an error only after receiving confidential information.  KBr. 50.  Kite's claims fall flat.  Not only could the jury reject his testimony for bias, it could recognize that his examination of this evidence extrinsic to the patent file, and his many meetings with Kite's counsel to discuss the intrinsic record, clouded his assessment of the error and its correction.  *See supra* at 11-12.

To the degree "real-world evidence" unmoored from the intrinsic record is informative, it refutes Kite's repeated, baseless insinuation that the CoC nefariously entrapped it.  *See* KBr. 2, 16, 20-21, 47-48.  Not only does unrebutted evidence demonstrate the CoC request (echoing the 2007 RCE) had nothing to do with Kite, Appx32923-32928 (Sadelain); Appx33041-33042 (Dash), but Kite's own licensing attempts both before and after the CoC belie any suggestion that it was blindsided or fooled, Appx33042.  Dr. Schuetz's company similarly sought a license both before and after the CoC, showing he believed the CoC was valid and the patent covered Dr. Sadelain's invention.  Appx33029-33031.

Finally, Kite again implies the claim-construction order precludes a finding that the error and its correction were clearly evident.  KBr. 54-55.  The district court construed the claim term "the amino acid sequence encoded by SEQ ID NO:6" to mean "Amino Acids 113-220 of CD28" before the CoC's 2013 effective date, and "Amino Acids 114-220 of CD28" after that date.  Appx117.  Claim construction, however, is a legal determination for the court, while the presence of a clearly evident error is a factual determination for the jury.  As Judge Otero recognized, a jury question on CoC validity remained after his claim construction.  Appx8411-8413 (SJ Opinion); Appx67 (JMOL Opinion).

### 2.    Kite Ignores The RCE

As Dr. Quackenbush explained, the RCE identified and justified the precise changes later made in the CoC, and the POSITA would readily understand from its presence in the patent file, and the history that followed, that the as-issued patent's inclusion of the extra nucleotides was an error that arose while addressing an unrelated formatting request.  No case has held a CoC invalid in such circumstances.  Kite says tellingly little in response.

All Kite offers is that the last (incorrect) pre-issuance sequence-listing submission accompanied a request to "'insert [this version] in the application . . . in place of the previously filed [correct] sequence listing.'"  KBr. 53-54 (quoting Appx35208); *see id.* at 57.  Replacing the prior version was necessary to fix the

unrelated formatting error, and in no way undermines the obvious explanation that the old version's use produced the mistaken inclusion of the extra nucleotides, straightforwardly corrected by again removing them.  Kite abandons on appeal Dr. Junghans's testimony that the RCE's explanations were "scientifically implausible."  *See* Appx33642.  For good reason.  Not only did Dr. Quackenbush explain—in testimony the jury could easily credit—why the explanations made good sense, but Dr. Junghans offered no explanation for why the applicants would have stopped the patent from issuing in order to make, and then abandon, a "scientifically implausible" correction.  Instead, Kite depends on his "assumption" that the older, erroneous version's use was intentional—an opinion the jury certainly was not required to credit, let alone accept as clear-and-convincing evidence.  Unlike Plaintiffs' coherent explanation, Kite's speculative theory fails to account for the reversion to the undisputedly incorrect version of SEQ ID NO:4, which Dr. Quackenbush explained and Kite never challenged.  Appx33838.

Kite argues "all that matters" is that—according to Kite—"Juno does not explain how the public would have clearly divined" the intrinsic record's meaning.  KBr. 54.  Actually, what matters is that the POSITA—highly skilled, per the parties' agreement, Appx136—would readily understand both the error and proper correction from the RCE, the primers, and the rest of the intrinsic record.  *E.g.*, Appx33836-33837.  To the extent Kite (improperly) uses the lens of the lay

"public," the jury here—drawn from the public—had no trouble resolving this question based on Dr. Quackenbush's clear testimony and the intrinsic record.

### C.    This Court May Also Affirm By Accepting Plaintiffs' Construction Of SEQ ID NO:6 Pre-CoC

The proper construction of SEQ ID NO:6 pre-CoC provides an alternate ground for affirmance.  Claim construction turns on "those sources available to the public that show what a [POSITA] would have understood disputed claim language to mean."  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc).  The district court's claim construction is ultimately a legal question reviewed de novo.  *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 329 (2015).

Even before the CoC, the POSITA, for the reasons described above, would have understood that the claimed invention did not require the seven extra nucleotides listed in SEQ ID NO:6.  *See I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 442 (1926) (relying on full intrinsic record, including prosecution history, in interpreting a patent "is not in any real sense, a re-making of the claim; but is merely giving to it the meaning which was intended").  The full intrinsic record shows the POSITA would readily accept the RCE, recognize that the last pre-issuance sequence listing submission reverted back to the wrong sequence (while reintroducing an uncontested typo in SEQ ID NO:4, but preserving corresponding changes to column 4), and understand the patent to cover amino

45

acids 114-220 of CD28, consistent with the primers and other aspects of the specification.  The trial record, including Dr. Quackenbush's explanatory testimony, further underscored these conclusions.  The district court should have given proper consideration to the RCE—part of the intrinsic record—but instead erroneously concluded that the sequence listing constituted a controlling "explicit definition," so that, before the CoC, "the amino acid sequence encoded by SEQ ID NO:6" meant "Amino Acids 113-220 of CD28."  Appx110; Appx 117 (emphasis omitted).

Because the proper construction of that claim term, both before and after the CoC, is "Amino Acids 114-220 of CD28," the CoC did not broaden the claims, and could not be invalid.  Whether this Court affirms based on the jury's application of the district court's claim construction, or based on the proper claim construction, the CoC is thus valid.

## III.    SUBSTANTIAL EVIDENCE SUPPORTS THE DAMAGES VERDICT

The jury's $778,343,501 verdict is fair.  This is the rare "billion-dollar case," KBr. 18, because the hypothetical negotiators would have been valuing a license allowing a competitor to market a product that it contemporaneously estimated was worth more than $6 billion for just a single indication, and would produce over $7 billion in operating profits over the life of the patent.  Appx33474-33475; Appx35553; Appx35705.  Indeed, while novel pharmaceutical products are often

46

equally valuable, most patent cases involving such pharmaceuticals arise under the Hatch-Waxman Act, and thus do not implicate damages.

As noted above, both sides' experts employed the comparable-license framework to estimate a reasonable royalty, using the Juno-Sloan Kettering license of the '190 Patent as a starting point, and adjusting based on differences between that license and the hypothetical license to Kite, such as Kite's status as a competitor, rather than collaborator, of Juno. Appx33439-33441; Appx33456-33457; Appx33765-33766; Appx33801-33803. At bottom, their disagreements were fact-bound disputes about application of their common methodology—an archetypal jury issue.

## A.    The Jury's Award Is Fully Supported

As Dr. Sullivan explained, the Juno-Sloan Kettering license (an agreement between collaborators, not competitors, and entered into at the clinical-research stage, well before commercialization) required three types of relevant payments: (1) a 7.25% running royalty, (2) milestone payments totaling $3.35 million if a Juno therapy using the '190 Patent obtained FDA approval, and (3) success payments totaling up to $150 million (based in increases in Juno's share price from its initial $1 price), which provided part of the compensation for "access to the technology" of the '190 Patent as set forth in a Side Letter Agreement to the Exclusive License Agreement. Appx36048-36052; Appx35733-35736;

Appx35755; Appx33460-33464; Appx33043-33046. Because Yescarta was already approved and Kite's share price had already appreciated more than thirtyfold by the time of the hypothetical negotiation, these terms produced a comparable-license baseline of $153.35 million plus a 7.25% running royalty. Appx33461-33464.

It was undisputed that a hypothetical license to Kite would be more expensive than the comparable license for two reasons: (1) Kite is a competitor, rather than collaborator; and (2) the technology was more developed—the license would allow Kite's already-approved product to immediately obtain the first-mover advantage. Both sides' witnesses agreed that both factors would make the hypothetical license more expensive. Appx33463-33473; Appx33367-33368; Appx33406-33408; Appx33456-33457; Appx33025-33026; Appx33390-33391. Dr. Sullivan made two adjustments to account for these differences, both specifically adjudged "sufficiently reliable to be presented to the jury" in Judge Otero's *Daubert* order. Appx92-93. First, Dr. Sullivan consulted a pair of licenses for a CAR-T patent involving a different costimulatory domain. In 2013, Juno licensed that patent from a research institution with a running royalty of 2.5%. Appx35810. And in a 2015 litigation settlement, it granted a competitor, Novartis, a sublicense with a running royalty of 4.75%. Appx33464-33466; Appx36081.

The 1.9-to-1 ratio of these royalty rates, Dr. Sullivan explained, called for a first upward adjustment of 90%. Appx33473; Appx33476.

Because this first adjustment accounted only partially for differences between the comparable and hypothetical licenses, Dr. Sullivan made a second adjustment as well. Kite in 2017 was a more dangerous competitor than Novartis in 2015. Appx33471-33473; Appx33476. For example, in 2017, Kite was focused on precisely the same cancer as Juno's lead product candidate, whereas in 2015, Novartis's lead product was for a different cancer than Juno's lead candidate. Appx33467-33472. Moreover, unlike Novartis's therapy in 2015, which was "still in development phase," Yescarta was market-ready in 2017. Appx33467. To account for these further differences, Dr. Sullivan compared the amount Juno estimated shortly after the Novartis license that competition from Novartis would cost it ($445 million/year) to the amount Juno estimated shortly after the hypothetical negotiation date that competition from Kite would cost it ($1.3 billion/year). Appx33471; *see* Appx36198-36199 (summaries of Sullivan's second adjustment). This generated a second adjustment factor of 192%. Appx33471-33473; Appx33476. Applying these two adjustments to the comparable-license baseline results in a $585 million upfront payment and a 27.6% running royalty, Appx33473-33476—the reasonable royalty the jury found and Judge Otero upheld.

A host of other evidence also supported this reasonable royalty. The jury heard from Celgene's experienced license negotiator that, for a "later-stage technology" like the '190 Patent in 2017, "it wouldn't be uncommon . . . to see a royalty rate in the range of 20, 30 percent," along with "a much more significant upfront payment." Appx33389-33392 (Dulac). Dr. Sullivan's 27.6% rate was far lower than the 60%-85% profit margin Kite projected for Yescarta just before the hypothetical negotiation. Appx33587; Appx35705. His $585 million upfront payment was less than the value Kite projected just for obtaining the first-mover advantage, and was modest compared to Yescarta's anticipated profitability. Appx33448-33454; Appx33587. For example, Gilead contemporaneously attributed $6.2 billion in value to approval of Yescarta for a single indication, and Kite contemporaneously projected over $7 billion in profits from Yescarta through expiration of the '190 Patent. Appx33442-33444; Appx33745-33748; Appx35705; Appx35553.

Kite, in contrast, argued for an unreasonably low damages award. Dr. Rao contended that damages should be only $69.7 million—a far better deal than the one Juno actually secured years earlier, under which it paid a *non*-competitor $150 million even *before* any royalties on sales, for *earlier-stage* technology. The jury reasonably rejected Kite's damages argument, and concluded that Kite would have agreed to a $585 million upfront payment and 27.6% running royalty in exchange

for the freedom to launch its multi-billion dollar business that had—and still has—no non-infringing CAR product. Indeed, at the time of trial, Kite was conducting at least ten clinical trials for other indications using the same infringing CAR construct. Appx33446-33447; Appx33369-33370; *see also* Appx36399.

## B.    The Jury Reasonably Rejected Kite's Fact-Bound Arguments

Kite's primary objection to Dr. Sullivan's testimony is not methodology, but results. Kite repeats ad nauseam that the jury's award exceeds the royalty in comparable licenses. But comparable licenses often require adjustments, even upward adjustments. *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1333 (Fed. Cir. 2015) (affirming 50% royalty rate that exceeded the royalty rate in any comparable license). And the evidence explained in detail why that was so here, making this case worlds apart from Kite's cited cases. *E.g.*, KBr. 63; *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009) (no "particularized expert testimony explaining how various differences between the real and hypothetical license negotiation" would "factor into the appropriate royalty"); *Wordtech Sys., Inc. v. Integrated Networks Sols, Inc.*, 609 F.3d 1308, 1319-20 (Fed. Cir. 2010) (no expert testimony on damages). Nor do Kite's limited challenges to particular aspects of Dr. Sullivan's analysis persuasively explain why his conclusions were wrong, let alone inadmissible, or why the jury's verdict was impermissible.

### 1.     Substantial Evidence Supports The Success Payments

Kite argues the success payments should be disregarded because they appear in the Side Letter Agreement rather than the Exclusive License Agreement. KBr. 64-65. Kite is wrong. The Side Letter Agreement itself says these payments provide part of the compensation for "the Exclusive License Agreement." Appx35733.

So too does testimony reflecting Juno and Sloan Kettering's shared understanding. Hans Bishop, Juno's co-founder and then-CEO, confirmed "[t]he thing [Juno was] most interested in was a CAR-T cell that Dr. Sadelain had invented"—*i.e.*, the license. Appx33401-33404. The success payments were "an important part" of the "agreement" through which Juno secured that right. Appx33405.

Sloan Kettering's understanding was the same. Dr. Dash confirmed the success payments were payments that "the license has" for "access to the technology." Appx33043-33045. She further testified that Sloan Kettering received approximately $150 million from Juno "for the license to the Sadelain patent," Appx33045-33046, a figure that includes, as Juno and Sloan Kettering agreed, the success payments as "compensation for the license."[3] As Judge Otero

---

[3] Kite's assertion that Juno made no success payments, KBr. 60-61, 70, is contradicted by the record. Appx33482-33486.

concluded, Dr. Sullivan's success-payment testimony was sufficiently reliable for the jury "based on the inclusion of the term to the [Juno-Sloan Kettering] License (via the Side Letter)." Appx72. The fact that Kite "disagreed with the inclusion of the success payment" "was a theory presented to and, based on the verdict, rejected by the jury." Appx72.

Turning to the Exclusive License Agreement, Kite insists a downward adjustment is needed because Juno received "know-how" in addition to patent rights. KBr. 65-66. Not so. The license specifies the same running royalty regardless of whether Juno uses Sloan Kettering's know-how. Appx33044-33045; Appx36048-36049. So too with the success payments. Though "not tied to the sales of the product," they still "compensate [Sloan Kettering] for access to the technology." Appx33043-33046 (Dash). Even if know-how is "valuable," as Dr. Sullivan readily acknowledged, Appx33513, the Exclusive License Agreement's requirement of full royalties even absent know-how's use applies equally to the hypothetical license. Appx36048-36049.

Kite's cited cases are inapposite. None is a biotechnology case, let alone one where the patent covers the sole therapeutic agent in the infringer's only product. Some involved allegedly comparable licenses unconnected to the infringed patent. KBr. 65-66 (citing *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 871 (Fed. Cir. 2010) ("little or no evidence of a link between the [allegedly

53

comparable] licenses and the claimed invention"), and *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 80 (Fed. Cir. 2012) (allegedly comparable licenses "did not involve" the infringed patent, or "even involve[]" methods of solving the same problem)). In others, no expert testimony explained adjustments made or not made. KBr. 66 (citing *Bandag, Inc. v. Gerrard Tire Co.*, 704 F.2d 1578, 1583 (Fed. Cir. 1983) (non-identical license could not demonstrate an "established royalty," but might support a hypothetical license that "may amount to less, the same, or more"), and *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1446-47 (Fed. Cir. 1990) (impermissible to "rely[] *solely* on the fee set forth in [a non-identical] license as a reasonable royalty")). None of these cases apply where, as here, expert testimony explains adjustments to a license addressing the same patent.

Kite also expresses displeasure with a snippet of Plaintiffs' closing argument and the district court's discretionary decision to exclude certain testimony from Dr. Rao. KBr. 67. Kite waived these issues by neither objecting during closing, nor appealing the evidentiary ruling. Nor does it even acknowledge or try to meet the abuse-of-discretion standards that would apply had it raised these issues. *TEK Glob., S.R.L. v. Sealant Sys. Int'l, Inc.*, 920 F.3d 777, 788 (Fed. Cir. 2019).

## 2.     The Jury's Award Is Properly Apportioned

Kite next asserts Dr. Sullivan failed to adjust his calculations to account for non-'190 Patent contributions to Yescarta (such as manufacturing).  KBr. 68-73. This Court recently reconfirmed this argument's flaw, reiterating the well-established principle that "[b]uilt-in apportionment effectively assumes that the negotiators of a comparable license settled on a royalty rate and royalty base combination embodying the value of the asserted patent." *Vectura Ltd. v. GlaxoSmithKline LLC*, __ F.3d __, 2020 WL 6788757, at *8 (Fed. Cir. Nov. 19, 2020); *id.* (disputes over whether a license is sufficiently comparable to build in apportionment are "properly left for the jury to resolve").  Even Kite's own cited authority supports this approach.  *Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1376-77 (Fed. Cir. 2020) (affirming verdict based on comparable licenses that "could reasonably be found to incorporate the required apportionment" without "quantitative adjustment of the royalty rate in the three [comparable] agreements").  Kite's other cases address distinct issues—whether the entire market value rule or calculating the royalty base using the smallest salable unit obviates the apportionment requirement.  *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1310-11 (Fed. Cir. 2018); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977-78 (Fed. Cir. 2018); *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326-27 (Fed. Cir. 2014).  These

cases, which involve multi-component software or electronic devices, do not undermine the accepted apportionment method of using comparable licenses.

Kite's claim that Dr. Sullivan "did the opposite" of apportionment is even further afield.  KBr. 70.  Kite argues its share price's thirtyfold appreciation was attributable to factors beyond the Sadelain backbone's use in Yescarta.  KBr. 70. But the success payments in the Juno-Sloan Kettering license functioned the same way.  Because apportionment was built into that license, including the success-payment component, no further adjustment was needed.

Kite also asserts Dr. Sullivan's second adjustment to the comparator license rested on "how much better YESCARTA® was expected to perform in the market than Novartis—thereby granting Juno the value of Kite's contributions."  KBr. 71. That misapprehends the adjustment's basis.  It was not Kite's superiority over Novartis, or the relative strength of their products, but the degree to which the licenses would undermine Juno's competitive position.  Appx33466-33473.  Juno would have demanded a higher royalty for sales that would cut more into its own future sales.  Appx33471-33473.  Dr. Sullivan's analysis accordingly took account of factors unrelated to the products' strengths or weaknesses, such as the fact that

Kite's lead product candidate, but not Novartis's, treated the same disease as

Juno's.[4]  Appx33467.

Kite claims the comparable-license framework cannot adequately apportion

because the jury's award exceeds the value of the comparable licenses.  KBr. 72.

Those differences are the result of well-explained, economically supported

adjustments to a license for the very same technology.  Appx33584-33586.

Indeed, though differing in application, Dr. Rao used the same approach and

arrived at a royalty rate of 10.34%, itself higher than the rate in any comparable

license.  Appx33802-33803.  Kite cannot now complain that an approach this

Court has repeatedly blessed and that its own expert used is inadmissible or

insufficient to sustain the verdict.

Finally, although apportionment is required even if the patent is "'viewed as

valuable, important, or even essential,'" KBr. 73 (quoting *LaserDynamics*, 694

F.3d at 68), the comparable-license framework bakes in apportionment.  Here, the

---

[4] Kite also refers to Juno's commercialization work, including Juno's Phase II clinical trial for adult leukemia patients using a CAR (JCAR015) covered by the '190 Patent.  KBr. 16-17.  Far from "fail[ing] catastrophically," as Kite puts it without any support, KBr. 16, that trial achieved complete remission for 56% of patients, more than double the rate without JCAR015.  Appx33093-33098.  Kite emphasizes the patients who unfortunately died during this trial.  KBr. 1, 17.  An investigation revealed the likely causes included, *e.g.*, the patients' age and "class effect[s]" common to many different CAR-T products, including Yescarta. Appx33099-33102; *see* Appx35926; Appx35930-35931 (Yescarta package insert). Juno opted to focus its limited resources on a different indication (lymphoma), for which it was using its alternative JCAR017 therapy.  Appx33103-33104.

invention was sufficiently important to support the verdict given Kite's repeated, failed efforts to address its '190 Patent problem by license or IPR; testimony supporting running royalty rates of "20, 30 percent," along with "a much more significant upfront payment"; and Kite's own projections, which left ample room for profit after the hypothetical license. *See supra* at 47-50; *see also* Appx72 (JMOL Opinion) (noting that Kite's "own witnesses . . . testified to the importance of the '190 Patent's CAR construct").

### 3. Differences Between The Comparable And Hypothetical Licenses Support Dr. Sullivan's Adjustments

Despite Judge Otero's thorough vetting (before, during, and after trial, *e.g.*, Appx92-98; Appx33426-33431; Appx33433), Kite briefly challenges each of Dr. Sullivan's two adjustments. For the first, Kite asserts that because Dr. Sullivan based the 90% adjustment on a ratio of running royalty rates, that adjustment cannot also apply to the upfront payment. KBr. 74. Kite cites no supporting authority. Disputes between experts over how to adjust comparable licenses within their agreed-upon framework is the epitome of a factual jury question. *See Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1212 (Fed. Cir. 2010).

Kite then argues Dr. Sullivan's second adjustment amounts to double-counting because, in Kite's view, both that adjustment and the success payments rest on "Kite's expected success selling CAR-T therapies." KBr. 74. That again mistakes the adjustment's nature, which turns on what Juno would demand as

58

compensation for the greater impairment to its competitive position. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970) (hypothetical negotiation would account for "anticipated amount of profits that the prospective licensor reasonably thinks he would lose as a result of licensing the patent"). That is distinct from the success payment's measurement of the degree to which the patented technology allowed Kite—with no alternative therapy or method of legally proceeding with Yescarta—to appreciate. Any overlap is unremarkable and unobjectionable. After all, the Juno-Sloan Kettering license both sides' experts deemed comparable included both milestone payments for FDA approval and running royalties on sales that required such approval.

## IV.   SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S WILLFULNESS FINDING AND JUDGE OTERO'S DISCRETIONARY ENHANCEMENT

### A.   Kite Willfully Infringed To Execute Its Business Plan

"[E]gregious cases typified by willful misconduct" beyond ordinary infringement are the paradigm of cases deserving enhanced damages. *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1934 (2016). Willfulness can be shown by "proof that the defendant acted despite a risk of infringement that was either known or so obvious that it should have been known to the accused infringer," *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1362 (Fed. Cir.

59

2016), and presents a jury question reviewed for substantial evidence. *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341-42 (Fed. Cir. 2016).

Enhanced damages prevent infringement from being a "heads-I-win, tails-you-lose" choice, requiring patent owners to mount expensive litigation against the brazen infringer just to recover the reasonable royalty the infringer should have paid at the outset. *King Instruments Corp. v. Perego*, 65 F.3d 941, 951 n.6 (Fed. Cir. 1995). In enhancing damages, a district court must "consider the particular circumstances of the case to determine whether it is egregious." *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1382-83 (Fed. Cir. 2017). Although the factors this Court laid out in *Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992), *abrogated on other grounds, Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), are useful guideposts, a "district court is not required to discuss the *Read* factors." *Presidio*, 875 F.3d at 1382.

Here, as Judge Otero recognized, Kite's behavior was as egregious as it gets, easily allowing a "reasonable jury [to] enter[] a finding of willfulness," as this jury did. Appx69. The evidence showed Kite knew Dr. Rosenberg copied Dr. Sadelain's invention, but used it anyway. Appx33224-33231; Appx35677-35679; Appx35437-35438. The evidence showed Kite's persistent but unsuccessful efforts to license the '190 Patent, and that Dr. Belldegrun lied about it at trial. Appx33026; Appx33032; Appx33035-33037; Appx35439-35441; *see*

Appx41 (Enhancement Opinion).  It showed Kite tried but failed to create a non-infringing product.  Appx33446.  And it showed Kite tried but failed to invalidate the '190 Patent via IPR after calling out the IPR's institution as one of its three business highlights that year, Appx33291-33297; Appx36162—even though Dr. Belldegrun later admitted he was unsurprised when the IPR failed, Appx27017.

Despite its well-documented knowledge of the barrier the '190 Patent posed for Yescarta, and its numerous, failed efforts to surmount it, Kite didn't just plow ahead with infringement—it chose "to accelerate YESCARTA® to market to its own advantage and to Plaintiffs' corresponding detriment."  Appx42 (Enhancement Opinion).  After all, Kite's (later, Gilead's) business plan required beating Juno to market.  Appx33182-33193.  If that necessitated infringement, so be it.

As Judge Otero explained, not only did "this behavior rise[] to the level of wanton, malicious and bad-faith behavior required for willful infringement," it also rendered "a 50% enhancement" of the compensatory award "appropriate." Appx42.  Judge Otero concluded that although the lifesaving nature of Kite's therapy "warrant[ed] mitigation," Kite's "flagrant actions cannot be completely pardoned."  Appx42.  Accordingly, Judge Otero enhanced damages by 50%, Appx42, rather than the doubling Plaintiffs requested, or trebling, either of which would have been justified by comparable decisions.  *E.g.*, *Arctic Cat Inc. v.*

61

*Bombardier Recreational Prods., Inc.*, 198 F. Supp. 3d 1343 (S.D. Fla. 2016)

(trebling damages), *aff'd*, 876 F.3d 1350 (Fed. Cir. 2017).  Judge Otero

emphasized that the preceding "enhancement determination" was "dispositive,"

before "provid[ing] additional analysis of the *Read* factors, which further support[]

the Court's determination."  Appx42.

### B.    Kite's Excuses Fall Flat

Kite tries to excuse its willful conduct as "simple 'intentional or knowing'

infringement."  *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 930 F.3d 1295, 1308 (Fed. Cir.

2019); KBr. 75, 77.  The jury had much more on which to ground its willfulness

finding.  *See SRI*, 930 F.3d at 1308 ("[I]t is the *circumstances* that transform

simple 'intentional or knowing' infringement into egregious, sanctionable

behavior, and that makes all the difference." (emphasis in original)).  The

circumstances surrounding Kite's infringement, highlighted by copious evidence of

its piracy and efforts to conceal, amply support the jury verdict.  *See supra* at 14-

17; Appx69 ("Defendant knew that Dr. Rosenberg from [NCI] copied

Dr. Sadelain's backbone"); *Polara Eng'g Inc. v. Campbell Co.*, 894 F.3d 1339,

1353-54 (Fed. Cir. 2018) (evidence of copying sufficient); *Georgetown Rail Equip*,

867 F.3d at 1245 (same).  Kite misstates Judge Otero's ruling in asserting he

upheld the verdict based "merely" on Kite's licensing attempts, its IPR, and the

lack of any evidence it had a good-faith belief in non-infringement or invalidity. KBr. 77.

Kite says the jury had to accept that "Kite had more than credible defenses to any patent-infringement action." KBr. 75-76. That is wrong. Kite presented no evidence it was aware of or believed in—let alone relied upon—any of these defenses in deciding to start infringing in 2017. KBr. 76-78. For these defenses to excuse willful infringement, Kite would have had to establish that it actually relied on them "at the time of the challenged conduct." *Halo*, 136 S. Ct. at 1933. Kite did not.

Kite claims it was "legally impermissible to base willfulness on the absence of evidence" of Kite's purported subjective belief, because Kite offered a lay witness on this issue whose testimony was excluded. KBr. 77. Kite waives this argument, however, by not challenging this evidentiary ruling. And for good reason: Kite had admitted it was not relying upon that person's views when its infringement began, or at any time thereafter. Appx10544-10546 (Interrogatory Responses); Appx69-70 (ruling that the person's views had been superseded by subsequent events—both Kite's choice to rely on advice of counsel and its later, repeated attempts to license and invalidate the '190 Patent, rendering the person's earlier view of purported non-infringement of "little relevance").

Kite says it was "in a double bind" in presenting its purported good-faith belief, because 35 U.S.C. § 298 says a defendant "need not present" counsel opinion to defend against willfulness.  KBr. 77-78.  Any wound, however, was self-inflicted.  If Kite wanted to rebut the evidence it deliberately infringed, it was free to do so by waiving privilege, or by presenting non-privileged, relevant evidence.  *Cf. United States v. Bilzerian*, 926 F.2d 1285, 1291-94 (2d Cir. 1991) (even in a criminal case, defendant faced choice of waiving privilege or forgoing testimony of his good-faith belief in the legality of his actions).  Section 298 is not a free pass requiring a court or jury to invent unpresented evidence of a good-faith belief in non-infringement or invalidity.  It simply precludes use of such an opinion's absence as affirmative proof of willfulness.  Kite does not, and cannot, allege that happened here.

Kite argues that the objective reasonableness of defenses remains "a strong indicator of nonwillfulness" post-*Halo* unless the infringer had no doubt it was infringing.  KBr. 78.  *Halo* says nothing of the sort.  *Halo* holds that the objective reasonableness of a defense is irrelevant unless the infringer shows *actual reliance* on that defense "at the time of the challenged conduct."  136 S. Ct. at 1933 (improper for "someone who plunders a patent" to "escape any comeuppance under § 284 solely on the strength of his attorney's ingenuity" in devising

64

defenses).  Here, there was no evidence of any reliance, and thus no basis for

JMOL on willfulness.

Finally, Kite's potential defenses to liability that it did not raise at trial do

not insulate it from a willfulness finding.  KBr. 76.  The Hatch-Waxman Act's safe

harbor is a red herring.  The law is clear that pre-infringement copying and other

pre-commercialization actions, such as Kite's safe-harbor activities here, remain

relevant to willfulness once infringement begins.  *Polara*, 894 F.3d at 1353-54.

And Kite's argument that the 2016 IPR institution decision provided "concrete

backing for its view that the '190 Patent was invalid," KBr. 76, disregards the

PTO's decision in December 2016—ten months before Kite's infringement

began—that the claims were *not* obvious.  Appx35325-35355.  As for Kite's

appeal of that already-lost case, KBr. 76, Kite cites no authority for why that

matters.  Regardless, even this thin reed disappeared with this Court's June 2018

Rule 36 affirmance.  Appx7791-7792.

### C.    Kite's Enhancement Challenge Is Groundless

Kite's only objection to Judge Otero's enhanced-damages award rests on its

erroneous view that Judge Otero "failed to independently assess" one of nine *Read*

factors—whether the case was close.  KBr. 79 (citing *Polara*, 894 F.3d at 1355-

56).  In fact, Judge Otero devoted a full, single-spaced page to assessing this factor.

Appx48-49 (under heading "*Read* Factor 5 – closeness of case":  "[T]he Court's

view of the live testimony, including the incredibility of Dr. Belldegrun's testimony as noted above, merits a finding that this factor weighs in Plaintiffs' favor."). That aside, there was no obligation to evaluate the *Read* factors at all. *Presidio*, 875 F.3d at 1382. Unlike in *Polara*, where this Court treated misapplication of a *Read* factor as grounds to remand for further consideration of enhanced damages, the enhancement award here was not "almost the maximum amount of enhanced damages." *See Polara*, 894 F.3d at 1355. And unlike in *Polara*, where the *Read* factors formed the core of the enhancement analysis, here they were merely a non-mandatory cross-check.

## CONCLUSION

The judgment should be affirmed.

Dated:  December 14, 2020

Morgan Chu
Alan J. Heinrich
Elizabeth C. Tuan
IRELL & MANELLA LLP
1800 Avenue of the Stars
Los Angeles, CA 90067
(310) 203-7000
mchu@irell.com

Matthew J. Rubenstein
JONES DAY
90 South Seventh Street
Suite 4950
Minneapolis, MN 55402
(612) 217-8800

Respectfully submitted,

/s/ *Gregory A. Castanias*
Gregory A. Castanias
Jennifer L. Swize
JONES DAY
51 Louisiana Ave. NW
Washington, D.C. 20001
(202) 879-3939
gcastanias@jonesday.com

Andrea W. Jeffries
JONES DAY
555 S. Flower St.
Los Angeles, CA 90071
(213) 489-3939

Lisa L. Furby
JONES DAY
77 West Wacker Dr., Suite 3500
Chicago, IL 60601
(312) 782-3939

# CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) and Circuit Rule 32(b).

1.    Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 13,999 words.

2.    The brief has been prepared in proportionally spaced typeface using Microsoft Word 2016 in 14 point Times New Roman font.  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.


Dated:  December 14, 2020                    */s/ Lisa L. Furby*

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2020, I filed the foregoing BRIEF OF PLAINTIFFS-APPELLEES via CM/ECF with the U.S. Court of Appeals for the Federal Circuit, which serves the brief on all counsel of record.

Dated:  December 14, 2020          */s/ Lisa L. Furby*